IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

| | | |
|---|---|---|
| **LUANN M. MORGAN** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **vs.** | ) | Civil Action Number |
| | ) | **6:07-cv-1684-UWC** |
| **MICHAEL J. ASTRUE,** | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Plaintiff brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking review of the final adverse decision of the Commissioner of the Social Security Administration ("SSA"). This Court finds the Social Security Administration failed to fully develop the record. Therefore, for the reasons elaborated herein, the Court will **REMAND** the decision denying benefits.

**I. Procedural History**

Plaintiff filed an application for Supplemental Security benefits on July 23, 2003. (R. 23.) This application was denied administratively at the initial and reconsideration stages. Plaintiff requested a hearing before an ALJ, which was held on March 23, 2005,

1

in Cullman, Alabama. (R. 23.) On May 9, 2005, the ALJ denied the claim. (R. 33.) This denial became the final decision of the Commissioner of the SSA when the Appeals Council refused to grant review on July 17, 2007. (R. 5.) Having timely pursued and exhausted her administrative remedies, Plaintiff filed an action for judicial review in Federal District Court pursuant to section 1631 of the Social Security Act, 42 U.S.C. § 1383(c)(3).

## II. Factual Background

At the time of the hearing, Plaintiff was a 28 year-old woman with a ninth grade education. (R. 460.) Plaintiff has past relevant work experience as an escort driver. (R. 459.) She has not engaged in substantial gainful activity since at least June 12, 2003. (R. 307.) Plaintiff suffers from depression, anxiety, asthma,[1] scoliosis, and migraine headaches.

In 1997 Plaintiff became a patient of Dr. James E. Moody until August, 2004. She then sought treatment with Dr. Mark S. Keating from December 2004 through at least 2005.

**A.    Headaches/Migraine**:

Plaintiff's records from Dr. Moody indicate she began complaining about tension headaches on January 10, 2001. (R. 229.) Two months later, in March, she again

---

[1] Plaintiff's shortness of breath is associated mostly with her back pain.

complained about tension headaches. (R. 227.) She again complained of headaches two months later in May. When Dr. Moody explained that her headaches might be due to tension, Plaintiff responded that she did not have anything going in her life about which to worry. Dr. Moody noted he would try her on Darvocet and if she did not improve he would try to find her another doctor for a referral. (R. 225.)

There is nothing in the record to indicate that Dr. Moody referred Plaintiff to a specialist for her headaches. However, Plaintiff applied for benefits prior to the present application and apparently under a consultive examination relating to that prior application. In January 2002, Plaintiff underwent a consultative examination by Dr. Samia S. Moizuddin. (R. 177-80.) Plaintiff complained of headaches two to three times a month and chronic back pain. Dr. Moizuddin recommend a CT of Plaintiff's back and referral to a headache specialist/neurologist for the headaches. (*Id*.) There is no record that any such referral was made.

Over one and one-half years later, Plaintiff underwent a consultative examination on November 6, 2003, performed by Dr. William R. Crouch a family practice doctor. Plaintiff complained of daily headaches and severe back pain. He did not make any notations or findings relating to the headaches. (R. 205-7.)

Over one year later, in December 2004, she saw Dr. Keeting complaining of irregular menstrual cycles. She also noted that her recent migraines had seemed be "greater." (R. 353-4.) Two months later, in early February 2005, Plaintiff reported to Dr.

Keeting that she had a sore throat, coughing, congestion and a bad headache. (R. 389.) The following month, on March 2, she complained that she had a frontal headache approximately twice weekly. (R. 390.) Later that month, on March 30, 2005, she complained of headaches. (R. 391.)

She returned on April 13, 2005, at which time the headaches had improved somewhat, but she was still having them. (R. 392.) Four days later, she had a CT of her head that showed no significant abnormality. (R. 422.)

**B.     Back pain/Scoliosis:**

On a February 10, 1998, visit, Dr. Moody noted that Plaintiff had marked scoliosis, but that the condition had been relatively asymptomatic. (R. 252.) Later that month, Plaintiff returned complaining of back pain. (R. 249.) Approximately two weeks later, Dr. Moody referred Plaintiff to a specialist for evaluation of her scoliosis. (*Id*.) However, the record does not appear to contain any documents relating to any such referral. Throughout the remainder of the year and through 2000, she called or visited Dr. Moody on at least ten occasions and did not appear to have complained about back pain. (R. 237-50.)

On April 24, 2000, she reported that she had been to the emergency room five nights ago for non-back related reasons. Dr. Moody's notes indicate that her scoliosis was stable. (R. 236.) A year later, on April 24, 2001, his notes indicate that Plaintiff had

chronic back pain which he believed was related to scoliosis. (R. 226.)

In January 2002, Plaintiff underwent a consultative examination by Dr. Samia S. Moizuddin. (R. 177-80.) Plaintiff complained of headaches and chronic back pain. Upon examination, Plaintiff was able to perform heel toe, squat and all extremities moved equally well. Her straight leg raise was normal. There was no atrophy or spasm in her back. Plaintiff was able to flex forward, extend backward and do lateral rotation without pain. Based upon these findings, Dr. Moizuddin recommend a CT of Plaintiff's back. (*Id*.)

Plaintiff underwent another consultative examination on November 6, 2003, performed by Dr. William R. Crouch a family practice doctor. Plaintiff complained of daily headaches and severe back pain. Dr. Crouch reviewed Plaintiff's records and performed an examination. He noted that Plaintiff seemed uncomfortable on the examination table. He also noted Plaintiff did not use assistive devices, but did ambulate to the left. He noted no difficulty with heal-toe raise. A "scoliosis study" revealed a maximum thoracic curvature of 35 degrees and a maximum lumbar curvature of 30 degrees. The disc spaces appeared to be well maintained and no significant arthritic changes were noted. He diagnosed Plaintiff with moderately sever scoliosis. (R. 205-7.)

After Plaintiffs's last visit to Dr. Moody in 2001, she had at least seven more visits or telephone calls through August 2004, with no apparent complaints about back pain. (R. 215-55.)

On March 30, 2005, she complained of back pain. (R. 391.) She returned on April 13, 2005, at which time she complained of back pain. (R. 392.) On June 15, 2005, she complained of lower back pain with an onset of that morning. (R. 397.) She had a MRI of her lumber spine on July 1 which revealed scoliosis. Nonetheless, the conus medullaris (the terminal part of the spinal cord) and cauda equina (nerves in lower back at the end of the spinal cord) were intrinsically normal. There was evidence of degenerative disk disease at L4-5 and L5-S1 where there was some fluid around the discs, which the radiologist described as mild. There was also moderate to severe osteoarthirtic change in the L-4-5 area. The radiologist concluded that Plaintiff had relatively mild degenerative disc disease at L4-5 and L5-S1. There was also a suggestion of a posterior annular tear at L5-S1, that was not confirmed by the images. Finally, there may have been some mild biforminal bulge versus protrusion, primarily at L4-5. (R. 420.)

C.  **Anxiety/Depression:**

On November 10, 2000, after receiving unpleasant information about the results of a pap smear, Dr. Moody noted that Plaintiff had considerable consternation, that she was prone to emotional disturbances and she had a predilection for hyperventilatory syncope. (R. 202.)

In April 24, 2000, Plaintiff reported to Dr. Moody that she had gone to the hospital five nights ago after having what appeared to be a hyperventilatory syncope with typical

paraeshthesia (numbness) and fear of impending doom.  (R. 236.)  Plaintiff reported the emergency room physician indicated she was having an asthmatic attack.  (R. 236.)  In July, Dr. Moody's notes indicate Plaintiff was having symptoms of hyperventilatory syncope.  (R. 231.)

In October 2003, Plaintiff underwent a consultative psychological examination performed by Dr. Charles E. Houston, Phd.  (R. 208-9.)  During the examination Plaintiff reported that she had been taking Librium several years ago for anxiety, which really helped.  However, she was financially unable to continue with the medication.  Approximately five months ago she had heard voices that told her to harm herself.  Plaintiff also reported that the preceding week she had a "spell" during which she could not control herself.  She became very angry, grabbed her husband, and tried to slam him to the ground.  She does not recall any triggering event and she does not know why she acted in this manner.

During the examination, Dr. Houston noted that Plaintiff adapted well to changing conditions of the evaluation, she was cooperative, pleasant, interested and persistent.  He concluded that Plaintiff suffered from anxiety disorder likely related to her physical pains and that her prognosis was guarded.  He also concluded she suffered from Depressive disorder of no specific origin.  He determined she was capable of performing daily takes, but that her activities and interests appeared to be moderately restricted.  Additionally, her ability to relate to others appeared to be somewhat affected.  She was somewhat capable

of independent functioning and her ability to meet the demands of competitive employment would likely be affected by her anxiety and depression which appear related to her physical complaints.

In December 2004, she returned to Dr. Mark S. Keeting's office complaining of physical problems and his notes indicate she had problems with depression in the past, but denied any current problems with depression. (R. 353-4.)

On January 1, 2005, she reported that she had previously attempted to hurt her spouse, but not currently. She was advised to go to a mental health center that day. (R. 361-6.) She also reported that during the summer she had heard voices talking to hear. However, she had improved and was not suicidal or homicidal. (R. 334-5, 361-6.) She was advised to go to a mental health center that day and diagnosed with possible schizophrenia. (*Id.*)

Two months later, on March 2, 2005, she complained that she had a frontal headache approximately twice weekly. She also complained that she still felt anxious and nervous. (R. 390.) Later that month, she noted her anxiety and depression were better. (R. 391.) She returned on April 13, 2005, at which time the anxiety and fatigue had become slightly worse. (R. 392.) Later that month she again complained of anxiety and depression. (R. 393.)

Plaintiff testified she only obtained mental health related treatment from a family doctor for two weeks. (R. 470-71.)

**D.     ALJ's Findings:**

After the administrative hearing, the ALJ found that Plaintiff suffers from severe impairments in combination, but that the impairments do not meet or equal a listing. (R. 28.)  He noted that Plaintiff had not sought mental health treatment.  The ALJ also noted that her treatment records indicate relatively few complaints of back pain.[2]  Additionally, she performed the physical examinations without difficulty.

### III.  Controlling Legal Principles

A disability claimant has a heavy, but not insuperable, burden to establish entitlement to benefits.  *Mims v. Califano*, 581 F.2d 1211, 1213 (5th Cir. 1978).  The district court's standard or scope of review is limited to determining whether the substantial evidence support's the Commissioner's decision.  *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  Additionally, the Court must determine whether proper legal standards were applied.  *Lewis v. Callahan*, 125 F. 3d 1436, 1439 (11th Cir. 1997) (citing *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987)).

Substantial evidence is more than a scintilla, but less than a preponderance.  It is such evidence a reasonable mind would accept as adequate to support a conclusion.  *See Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Bloodsworth v. Heckler*, 703

---

[2]  Plaintiff has sought treatment countless times for numerous medical problems such as fibrous cysts, cysts on other parts of her body, problems with her reproductive organs, sinus problems, foliculitis, and gallstones.

F.2d 1233, 1239 (11th Cir. 1983). In contrast, the Commissioner's legal conclusions are more closely scrutinized. "The [Commissioner's] failure to apply the correct law or to provide the reviewing Court with the sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 969 F.2d 1143, 1145-45 (11th Cir. 1991).

Applicable agency regulations require a sequential evaluation of adult disability claims. 20 C.F.R. § 404.1520 (1983). The first consideration is whether the claimant is working. If the claimant is working, she is not disabled. If the claimant is not working, the Commissioner must determine whether the claimant suffers from a severe impairment. If the claimant does not suffer from a severe impairment, she is not disabled. If the claimant suffers from a severe impairment, then the Commissioner must consider whether the claimant meets any of the listings in 20 C.F.R. pt 404, subpt P, app. 1 ("Listing"), which details "impairments which are considered severe enough to prevent a person from doing any gainful activity." 20 C.F.R. § 404.1520(a). *See Edwards v. Heckler*, 755 F.2d 1513, 1515 (11th Cir. 1985). If the claimant's medical profile meets the criteria for an impairment in the "Listing," then the claimant is disabled by law and no further inquiry is necessary.

The burden is on the claimant to show that she meets the criteria under the listing. To meet the listing, the claimant must be (1) diagnosed with a condition that is listed or its equivalent, and (2) provide objective medical reports documenting that this condition

meets the specific criteria of the applicable listing and duration requirement. *See Wilkinson v. Bowen*, 847 F.2d 660, 662 (11th Cir. 1987).

When a claimant's "severe" impairment does not fall within a Listing, but nonetheless restricts her ability to perform basic work activities, the ALJ must then assess the claimant's residual functional capacity and the range of work activities that the claimant could perform despite his impairments. This evaluation must give consideration to claimant's subjective complaints, accounting for nature of pain, medication, treatment, functional restrictions, claimant's daily activities, and other relevant factors. 20 C.F.R. § 404.1512.

Additionally, pursuant to 20 C.F.R. § 404.1523, the ALJ is required to consider the disabling effect of multiple impairments:

> In determining whether your physical or mental impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all your impairments without regard to whether any such impairments if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medially severe combination of impairments, we will determine that you are not disabled.

Pain alone can be disabling. When a claimant claims disability based solely on pain, a three-part standard is utilized in assessing the credibility of his testimony. The claimant must establish evidence of an underlying impairment and either: (1) objective medical evidence to confirm the severity of pain alleged, or (2) a finding that the

impairment is of such a severity that it can be reasonably expected to cause the pain alleged. *See, e.g.*, *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986); *Marbury v. Sullivan*, 957 F.2d 837 (11th Cir. 1992) (emphasis added).

### IV.  Analysis

This Court must remand the Commissioner's decision because the record was not fully developed and the Commissioner failed to fully consider the opinion of the consulting mental health provider, Dr. Houston.

Although Plaintiff's CT failed to show any significant abnormality of her brain, Plaintiff's repeated complaints of headaches are reflected through out her treatment records.  Indeed, her treating physician recommended Darvocet and noted he would refer her to a specialist if the medication was not effective.  Additionally, the Court notes that the consulting physician recommended evaluation by a headache specialist or neurologist. Given this evidence, the Commission should have obtained such an evaluation.

With respect to Plaintiff's back, the ALJ is correct that her complaints are relatively infrequent.  However, there is no question that she has scoliosis and that her objective tests showed moderate to severe osteoarthirtic change.  Additionally, the objective test indicated  a suggestion of a posterior annular tear at and possibly mild biforminal bulge versus protrusion, primarily at L4-5.  Given these findings, Plaintiff should have been evaluated by an orthopedic specialist.

Finally, with respect to Plaintiff's mental health, there is nothing in the record to

explain why Plaintiff did not seek mental health treatment.  Although Plaintiff reported hearing voices, she later reported her condition had improved.  Nonetheless, her treating physician indicated she might have schizophrenia and she was advised to seek mental health treatment immediately.  Moreover, the SSA's own consulting mental health professional determined that Plaintiff's activities and interests appeared to be moderately restricted.  Additionally, her ability or relate to others appeared to be somewhat affected.  She was somewhat capable of independent functioning and her ability to meet the demands of competitive employment <u>would likely be affected by her anxiety and depression which appear related to her physical complaints</u>.

     Accordingly, once the SSA obtains consultations from an orthopedist, as well as a neurologist and/or headache specialist, and an evaluation on whether Plaintiff suffers from schizophrenia, the agency should carefully consider whether Plaintiff's impairments in combination are disabling.

     Therefore, by separate order, the decision denying benefits will be reversed and remanded for further proceedings.

     Done this 30th day of April, 2008.

_____
U.W. Clemon
United States District Judge